

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*Michelle V. Larson*

**Signed February 24, 2022**

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **JSAA REALTY, LLC** | ) | **Case No. 20-32504** |
| | ) | |
| **Debtor.** | ) | **(Jointly Administered)** |
| | ) | |

## MEMORANDUM OPINION ON CONFIRMATION
## OF AMENDED PLAN OF REORGANIZATION AND
## MOTION FOR RELIEF FROM AUTOMATIC STAY

The issue before the Court addressed by this Memorandum Opinion is whether the Debtor JSAA Realty, LLC's Amended Plan of Reorganization dated March 25, 2021, as modified by the Debtor's Modification to Plan of Reorganization (together, the "**Plan**") comports with the requirements for confirmation pursuant to chapter 11 of the Bankruptcy Code (the "**Code**"). Specifically, the Court is called upon to determine whether the Plan fairly and equitably treats the claim of the Hak Man Lee Trust (the "**Trust,**" and, together with the Debtor, the "**Parties**"), whether the Plan was proposed in good faith, whether the Plan is in the best interests of creditors, and whether the Plan is feasible.

1

Beginning on May 10, 2021, the Court held a hearing (the "**Confirmation Hearing**") on confirmation of the Plan and the Trust's Objection to Confirmation of the Plan. The Confirmation Hearing was thereafter continued to, and concluded on, May 21, 2021. Two impaired classes of creditors voted to accept the Debtor's Plan. The Debtor sought to confirm the Plan over the objections of the Trust pursuant to § 1129(b) of the Code. The Trust raised objections regarding alleged bad faith in filing and proposing the Plan, the continuation of the Debtor's current managers, alleged violations of the "Best Interests of Creditors Test" pursuant to § 1129(a)(7) of the Code, feasibility, and fair and equitable treatment pursuant to § 1129(b)(2) of the Code.

The Court has considered the pleadings and all briefing filed in connection with the Confirmation Hearing, the testimony of witnesses, the exhibits admitted into evidence, and the arguments of counsel. Furthermore, the Court incorporates its findings of fact from the Adversary Opinion (as defined below) by reference into this Memorandum Opinion. The following constitutes the Court's findings of fact and conclusions of law[1] in support of its ruling pursuant to Federal Rules of Bankruptcy Procedure 9014 and 7052.

As will be set forth more fully below, the Court finds and concludes that the Trust's Objection should be overruled in its entirety and that the Plan should be confirmed as modified.

## I.     JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 151 and 1334, and the standing order of reference in this district. This is a core proceeding under 28 U.S.C. § 157(b).

## II.     FACTUAL BACKGROUND AND PROCEDURAL POSTURE

### A.  Factual Background

---

[1] Any finding of fact that should more appropriately be characterized as a conclusion of law should be regarded as such, and *vice versa*.

This Court recently entered its findings of fact and conclusions of law (the "**Adversary Opinion**") after a three-day evidentiary trial in Adv. No. 21-3042 (the "**Adversary Proceeding**") resolving the Debtor's Objection to the Trust's Claim.[2] As will be discussed below, the Court held this matter in abeyance pending the resolution of the Adversary Proceeding at the Parties' behest, as the Parties believed that the determination of the Trust's claim was a necessary precursor to confirmation of the Plan. Many of the Court's findings of fact in the Adversary Opinion are highly relevant to the issues presented to the Court with regard to confirmation, specifically including background information on Sunshine Metro Investments, LLC ("**Sunshine**"), the lender from which the Trust acquired the vast majority of its claim against the Debtor, and the terms of a promissory note the Debtor executed in favor of Sunshine in 2016 and amended in 2020. Because of the high degree of relevance and the similarity of the parties, the Court hereby incorporates its findings of fact in the Adversary Opinion into this Memorandum Opinion.

The Debtor is a Texas limited liability company formed in 2016. The Debtor is managed by its sole members, Arpit Joshi and Andy Sinkular (together, the "**Members**"), each of whom owns a 50% membership interest in the Debtor. The Members are also owners and managers of JSAA Enterprises, Inc. ("**Enterprises**"). The Members formed Enterprises in 2004 for the purpose of acquiring a piece of real property located at 11505 Anaheim St., Dallas, TX 75229 (the "**Property**"). Enterprises was engaged in the business of operating an adult video store and movie theater on the premises, which operated successfully for a number of years. In 2011, the adult DVD sales market, and thus Enterprises' business, hit a bottom, causing the Members to make the decision to switch industries. The Members thus began renovating the property with the ultimate

---

[2] Amended Memorandum Opinion and Order Determining Hak Man Lee Trust's Claim Against the Debtor, JSAA Realty, LLC v. Hak Man Lee Trust (Adv. No. 21-3042), ECF No. 45 (hereinafter, the "**Adversary Opinion**").

goal of converting the Property to an adult cabaret and nightclub. Although the Members invested significant personal financial resources, funding for the renovations stalled in or around 2016.

The Members, through the referral and with the assistance of their external accountant, Pawan Bagaria, began negotiating a commercial loan with Sunshine. As part of these negotiations, the Members formed the Debtor and transferred the Property from Enterprises to the Debtor at Mr. Bagaria's behest. Sunshine and the Debtor consummated their loan agreement by execution of a promissory note (the "**Original Note**") and deed of trust on November 16, 2016, and renovations continued on the Property.[3] In July of 2020, the Debtor and Sunshine amended the Original Note (the "**Amended Note**"), increasing the principal due thereunder to $465,000.00, increasing the interest rate to 10%, and amending the payment terms. Despite receiving additional funds from multiple sources, including Sunshine and the Members' family and personal acquaintances, the Members could not complete renovations on the Property by September of 2020. On September 10, 2020, an attorney acting on behalf of Sunshine recorded a Notice of Foreclosure on the Property, setting the date for such foreclosure sale as October 6, 2020, due to alleged defaults under the Amended Note. On October 2, 2020 (the "**Petition Date**"), the Debtor filed its voluntary petition under chapter 11 of the Code (the "**Petition**").

### B. Procedural Posture

On December 1, 2020, the Trust filed its Transfer of Claim Other than for Security, providing that the Trust had acquired Sunshine's claim during the course of the bankruptcy proceedings.[4] Thereafter, the Trust began a pattern of objecting to nearly each and every one of the Debtor's substantive filings, creating, essentially, a two-party dispute between the Debtor and

---

[3] For a more fulsome record of the factual background related specifically to the relationship between the Debtor, Sunshine, and, eventually, the Trust, refer again to the Adversary Opinion. Adv. No. 21-3042, ECF No. 45 at 4–11.
[4] ECF No. 15.

the Trust. The Debtor filed its Disclosure Statement and Plan on December 29, 2020.[5] On January 21, 2021, the Trust filed its Objection to the Debtor's Disclosure Statement.[6] The Debtor filed its Amended Disclosure Statement on January 29, 2021.[7] On February 1, 2021, the Trust also objected to the Amended Disclosure Statement.[8] On February 2, 2021, the Court held a hearing on the Amended Disclosure Statement, at the conclusion of which the Court provided several revisions required for its approval of the Amended Disclosure Statement.

The Debtor filed its Second Amended Disclosure Statement and Amended Plan on February 26, 2021.[9] On March 2, 2021, the Debtor filed its Third Amended Disclosure Statement, drawing yet another objection from the Trust on the following day.[10] On March 4, 2021, the Court held a hearing on the Third Amended Disclosure Statement, at the conclusion of which the Court again provided several amendments required for approval of the Third Amended Disclosure Statement. On March 26, 2021, the Debtor filed its Fourth Amended Disclosure Statement and another Amended Plan, drawing no further objection from the Trust.[11] On March 29, 2021, the Court entered its Order Approving the Fourth Amended Disclosure Statement and Fixing Time for Filing Acceptances or Rejections of Plan, Combined with Notice Thereof.[12]

On March 31, 2021, the Trust filed a second Transfer of Claim Other than for Security, providing that the Trust had acquired the claim of Home Tax Solutions, LLC in the amount of $21,091.68.[13] On the same day, the Trust filed its Motion for Relief from Automatic Stay (the "**Lift Stay Motion**"), in which it sought relief from the automatic stay to foreclose on the Property

---

[5] ECF Nos. 19–20.
[6] ECF No. 24.
[7] ECF No. 26.
[8] ECF No. 27.
[9] ECF Nos. 35–36.
[10] ECF Nos. 37–38.
[11] ECF Nos. 44–45.
[12] ECF No. 46.
[13] ECF No. 47.

for the Debtor's alleged failure to file a reasonably confirmable plan within 90 days of the Petition Date and for the Debtor's alleged bad faith in filing the Petition.[14] The Debtor filed its Response to the Lift Stay Motion on April 14, 2021.[15] Thereafter, on April 27, 2021, the Debtor filed its Objection to [the Trust's] Proof of Claim 2 (the "**Claim Objection**").[16] The Trust filed its Objection to the Plan (the "**Objection**") on May 3, 2021.[17]

On May 10, 2021, the Confirmation Hearing began. The Court held a hearing on the Lift Stay Motion together with the Confirmation Hearing. The Court heard testimony from three witnesses on that day and thereafter continued the Confirmation Hearing to May 21, 2021. In the interim period, on May 18, 2021, the Debtor filed its Modification to Plan of Reorganization, providing for the treatment of the Trust's claim that is at the core of this Memorandum Opinion.[18] On May 21, 2021, the Court heard testimony from an additional five witnesses, and took the matter under advisement, permitting post-trial briefing by May 28, 2021. On May 25, 2021, the Trust filed its Objection and Response to the Claim Objection.[19] On May 28, 2021, the Parties each filed post-hearing briefs with regard to confirmation of the Plan.[20]

On June 23, 2021, the Court held a status conference regarding the Claim Objection, at which the Parties agreed that the Claim Objection must be heard as an adversary proceeding, but initially agreed that the Court need not hold confirmation in abeyance pending the same. Thereafter, on June 28, 2021, the Debtor filed its Complaint initiating the Adversary Proceeding.[21] On June 30, 2021, the Parties requested a further status conference regarding the Confirmation

---

[14] ECF No. 48.
[15] ECF No. 57.
[16] ECF No. 61, converted to an adversary proceeding by ECF No. 108.
[17] ECF No. 65.
[18] ECF No. 94.
[19] ECF No. 101.
[20] ECF Nos. 102, 103.
[21] ECF No. 108.

Hearing, at the conclusion of which the Court agreed that confirmation would be held in abeyance pending the hearing and determination of the Adversary Proceeding.

### C. Plan Components and Objections

As stated previously, the Plan drew only one objection—that of the Trust. The Plan provides that the Trust's allowed secured claim is impaired. The Debtor proposed to pay the Trust's claim over a period of 60 months based upon a 180-month amortization at an annual interest rate of 6%. The Debtor also proposed, however, to increase its payment to the Trust on an annual basis as follows: (1) monthly payment of $3,890.00 from the Effective Date through December 31, 2021; (2) monthly payment of $4,890.00 from January 1, 2022 through December 31, 2022; (3) monthly payment of $5,890.00 from January 1, 2023 through December 31, 2023; (4) monthly payment of $6,890.00 from January 1, 2024 through December 31, 2024; and (5) $7,890.00 from January 1, 2025 through the fifty-ninth month following the Effective Date. The Debtor finally proposed to pay all remaining interest and principal due to the Trust in the sixtieth month following the Effective Date of the Plan. During this time, the Debtor proposed that the Trust would retain its lien on the Property and that all other terms of the Amended Note and any security documents would remain in full force and effect.

The Trust objected to the Plan generally as being filed in bad faith, lacking feasibility, and not being in the best interests of creditors. The Trust objected to the treatment of its claim under the Plan, specifically, on the ground that such treatment is not fair and equitable as to the Trust. The Trust asserted that the Debtor's only accessible lending market is the "hard money lending" market and, thus, the Trust ought to receive a commensurate interest rate post-confirmation.

### D. Witness Testimony

The Parties presented testimony from a wide variety of witnesses. The Court heard significant testimony related to the appropriate valuation of the Property as well as the market rate for rental of the space.[22] The Debtor presented the testimony of Hank Gaines, who the Court designated at the Hearing as an expert on the sale and lease of commercial real estate, with regard to the fair market rental value of the Property in its current and in its completed states. The Court found Mr. Gaines to be a credible witness. Mr. Gaines testified that, based on his site visits and the current condition of the Property, the rental value for the Property on the open market after retrofitting it to a warehouse would be $4.00 per square foot annually. That price, Mr. Gaines testified, would be commensurate with 25 other available warehouses per comparables he obtained from the Costar database, a nationally recognized source of comparable market data on commercial real estate sales. Mr. Gaines further testified that only 15,000 square feet of space would be usable in the Property's current condition. Those 15,000 square feet, Mr. Gaines testified, could be rented at a gross rate of $6.00 per square foot, yielding a monthly rental rate of $7,500.00, or, net of taxes, insurance, and utilities (otherwise known as the "triple net" rental rate) approximately $5,000.00.

The Debtor also elicited testimony from Mr. Gaines that the rental rate would likely increase substantially upon completion of the renovations on the Property. This increase, however, would be tempered by the "special use" nature of the Property, operating as a sexually-oriented business ("**SOB**"). This special use, Mr. Gaines testified, reduces the market of other people or

---

[22] After the transfer of the Property from Enterprises to the Debtor, the Debtor leased the Property back to Enterprises pursuant to an "informal lease," pursuant to which Enterprises agreed to pay rent to the Debtor in the amount of the payment due under the promissory note with Sunshine. The Debtor later memorialized the previously "informal" lease as part of the Court's conditions on approving the Debtor's Disclosure Statement. A copy of the formal lease between Enterprises and the Debtor was admitted at the Confirmation Hearing as the Debtor's Exhibit E. ECF No. 66-5.

businesses that would be willing to acquire or lease the Property. Finally, Mr. Gaines opined that a "very conservative" estimate of the value of the Property for sale on the market was $2.6 million.

The Debtor also presented the testimony of Melissa Miles, a licensed attorney and the former section head of the SOB litigation division for the City of Dallas, who testified to her extensive experience both prosecuting and defending businesses possessing SOB licenses. Although the Debtor did not move to designate Ms. Miles as an expert, the Court nonetheless found Ms. Miles to be highly credible. Ms. Miles testified that, during her 12-year tenure prosecuting violations by businesses possessing SOB licenses, she knew of only two businesses that had never been reported for or prosecuted as to a violation of SOB regulations, one of which was the Debtor.

The Trust proffered Sharon Friedberg, a commercial real estate broker with Fischer Company, as its expert witness on valuation in the commercial real estate market, in rebuttal to Mr. Gaines. The Court, on the Trust's motion, designated Ms. Friedberg as an expert on commercial rental rates and further found her to be a credible witness. Ms. Friedberg testified that Costar, the primary source for Mr. Gaines' opinion as to rental value, was only approximately 75% accurate, and that she typically contacted brokers directly for the purposes of valuation. Although Ms. Friedberg admitted to never entering the Property, she testified that the fair market rental value of the Property, under its current use as a *retail* business, rather than an industrial business or warehouse, would be approximately $10-12 per square foot triple net. Finally, Ms. Friedberg testified that the current rental rate paid from Enterprises to the Debtor was too low and that the Debtor could find a tenant that would pay a higher rental rate.

The most relevant expert testimony for the purposes of resolving the Trust's Objection was the testimony of David Montgomery Busch, a financial mortgage broker and private lender with

Urban Coyote Holdings, who the Trust proffered, and the Court designated, as an expert in the hard money lending market. Mr. Busch's qualifications were properly established and he offered extensive testimony as to the typical terms of hard money loans. Mr. Busch testified that hard money loans are typically sought by companies who have been excluded from the traditional commercial lending market due to a high degree of risk in lending to them. He testified that, as of 2021, typical hard money rates are approximately 11–12%, reaching as low as 9–10% for what Mr. Gaines referred to as "institutional" hard money lenders or life insurance companies, and typical maturities are between one and five years. Mr. Busch testified that a typical hard money loan requires interest-only payments over the entire course of the loan with a balloon principal payment due in the last month of the term. Finally, Mr. Busch testified that hard money lenders typically require large upfront origination fees. On cross-examination, Mr. Busch testified that traditional commercial loans bear interest at 4–6%, amortize principal over some portion of the term (*i.e.*, require principal and interest payments), and very commonly contain adjustable interest rates or balloon payments. The Court found Mr. Busch to be a credible witness. Notably, however, Mr. Busch did *not* testify as to any knowledge of the Debtor, the Debtor's business, its original lender, Sunshine, the Trust, or what interest rate would be appropriate for lending *to the Debtor*. Therefore, Mr. Busch's testimony, although credible, could be given little weight.

The Debtor also presented the testimony of two other witnesses, Amal Shah and Samir Bhatt, both of whom testified to their intention and capability to invest the necessary capital to complete the necessary renovations to the Property. Mr. Shah testified that he planned to invest $100,000.00 after the closing of the sale of a piece of real property he owned in Las Vegas. Mr. Bhatt testified that he intended to invest $200,000.00, which he stated he had in ready funds as of

the date of the Confirmation Hearing. The Court found both Mr. Shah and Mr. Bhatt to be credible witnesses.

### III. ANALYSIS

The requirements for confirmation of a chapter 11 plan are found, in large part, in § 1129(a) and (b) of the Code. As most relevant here, the Code requires that the plan be proposed in good faith,[23] in the best interests of creditors,[24] feasible,[25] and that any impaired class who rejects the plan be treated fairly and equitably under the plan.[26] The Court will address each of the Trust's objections to the Plan and the treatment of its claim thereunder in turn.

#### A. Fair and Equitable Treatment of the Trust's Claim

The Court will first address the Trust's objection that the Plan does not propose a fair and equitable treatment of its secured claim. Fair and equitable treatment, as applied to holders of secured claims, requires that the debtor choose one of three options: (1) the secured creditor retains its lien and receives payments under the plan totaling "at least the allowed amount of such claim, of a value, as of the effective date of the plan;" (2) the collateral securing the secured creditor's lien is sold and the lien attaches to the proceeds of such sale; or (3) the secured creditor realizes the "indubitable equivalent" of the creditor's secured claim. 11 U.S.C. § 1129(b)(2)(A). The Debtor proposes to invoke the first option and pay the Trust the present value of its claim over the lifetime of the Plan.

The Trust argues that the appropriate rate of interest payable on its claim in this case is 10%, which is the contractual rate of interest under the Amended Note. The Debtor, however,

---

[23] 11 U.S.C. § 1129(a)(3).
[24] *Id.* at § 1129(a)(7); *see id.* at § 1129(a)(5) (requiring that the proponent of the plan disclose the identity of any post-confirmation officers and that the continuance of such officers is consistent with the interests of creditors, equity holders, and public policy).
[25] *Id.* at § 1129(a)(11).
[26] *Id.* at § 1129(b)(1)–(2).

proposes to pay the Trust's claim at a 6% interest rate post-confirmation. This dispute is highly analogous to the dispute at the center of *In re SJT Ventures, LLC*, in which a creditor objected to confirmation on the ground that, as a fully secured creditor, it was entitled to the contractual rate of interest. 441 B.R. 248, 250 (Bankr. N.D. Tex. 2010) (Hale, J.). In that case, Judge Hale thoroughly walked through existing case law regarding the appropriate method by which to determine to what interest rate an oversecured creditor is entitled post-confirmation. *Id.* at 251–56.

As in this case, the question before the court in *SJT Ventures* was "how to determine the appropriate rate of post-confirmation interest in a Chapter 11 plan for repayment of an over-secured debt backed by real property." *Id.* at 251. Of primary importance in this case, Judge Hale noted that the Fifth Circuit previously held that the Supreme Court's decision in *Till v. SCS Credit Corp.* foreclosed the presumption that the contractual interest rate applied automatically post-confirmation. *Id.* at 252 (citing *Drive Financial Servs., L.P. v. Jordan*, 521 F.3d 343, 350 (5th Cir. 2008). The Fifth Circuit, in *Wells Fargo Bank, N.A. v. Texas Grand Prairie Hotel Realty, L.L.C.*, held that "the vast majority of bankruptcy courts have taken the *Till* plurality's invitation to apply the prime-plus formula under Chapter 11." 710 F.3d 324, 333 (5th Cir. 2013). The Fifth Circuit further held that *Till* also "appears to endorse a market rate approach under Chapter 11 *if* an efficient market . . . exists," but that "courts almost invariably conclude that such markets are absent." *Id.* (internal quotations omitted) (emphasis in original). Furthermore, this district has consistently expressed a preference for a market-based approach for determining the appropriate interest rate post-confirmation in chapter 11 cases. *Id.*; *In re Northwest Timberline Enter., Inc.*, 348 B.R. 412, 423 (Bankr. N.D. Tex. 2006) (Jernigan, J.); *In re Mirant Corp.*, 334 B.R. 800, 821–22 (Bankr. N.D. Tex. 2005) (Lynn, J.). "A court of equity must seek out the approach that will

most fairly and accurately account for the characteristics of the debtor and the market value of the creditor's claim." *SJT Ventures*, 441 B.R. at 255. In this case, the Court's primary task is to determine whether the Trust is entitled to a "hard money loan" interest rate, considering the respective attributes of, and the relationship between, Sunshine and the Debtor, given that the Trust acquired the loan from Sunshine, the Debtor's prior lender.

In *SJT Ventures*, the court leaned heavily on uncontroverted expert testimony in which an expert opined on an appropriate interest rate given the facts of that case. *Id.* at 255–56. In this case, a significant limitation is the relative lack of expert testimony informing the Court's analysis. No economist or other true interest rate expert testified. The sole expert on loan terms, Mr. Busch, testified credibly as to traditional terms for both hard money loans and traditional commercial real estate loans. Absent from his testimony, however, was an opinion as to what terms *this Debtor*, or even this type of business, could likely obtain on either the traditional or hard money lending markets. Likewise absent from the record is evidence that Sunshine was in the business of hard money lending. Notably, Sunshine's representative, Mr. Doddi, did not testify at the Confirmation Hearing. Nor did a representative of the Trust testify at the Confirmation Hearing. Even incorporating Mr. Doddi's testimony at the trial on the Adversary Proceeding, the Court was left wanting for evidence of this nature. Sunshine was by no means a traditional lender, but Sunshine could not be deemed a hard money lender in the absence of evidence.

In reviewing the record from the Confirmation Hearing and the Court's findings of fact in the Adversary Opinion, the Court is left with the conclusion that the Debtor's proposed 6% interest rate is fair and equitable under these circumstances. As discussed above, the Trust is not presumptively entitled to the contractual rate of interest pursuant to Fifth Circuit precedent and prior case law in this district. *Drive Financial*, 521 F.3d at 350; *see SJT Ventures*, 441 B.R. at

252. Additionally, the Court is not persuaded that the circumstances in this case warrant such an interest rate post-confirmation. First, the Trust is substantially oversecured. The Trust's own appraisal report stated an "as is" valuation for the Property of $1,885,000.00. The Trust's $495,083.82 secured claim,[27] and the only allowed claim exceeding $25,000.00, therefore has a generous equity cushion which, in turn, substantially reduces the risk associated with the Trust's claim.

The Court further finds that the Trust is not entitled to, nor does this loan justify, a hard money interest rate. The Court is utterly without evidence that Sunshine or the Trust should be considered a hard money lender. Mr. Busch testified, and it is commonly accepted, that entities turn to the hard money lending markets after being foreclosed from transacting with traditional commercial lenders, whether due to a lack of creditworthiness or due to perceptions of certain industries. The Trust, however, put forward no evidence that the Debtor, prior to execution of the Original Note in late 2016, had been foreclosed from accessing the traditional commercial lending market. Additionally, neither the Debtor nor the Trust proffered any additional expert testimony as to the risk factors associated with *this* Debtor, risk factors or other considerations with regard to lending to adult nightclubs, nor the appropriate rate of interest for *this* loan.

Rather, the evidence at the Confirmation Hearing, in conjunction with the Court's findings of fact in the Adversary Opinion, show that the Debtor was referred to Sunshine by Mr. Bagaria, who notably represented *both* Sunshine and the Debtor. Moreover, the Court found that the Debtor thereafter sought, and very nearly obtained, a traditional commercial loan from Commonwealth Business Bank ("**CBB Bank**") in 2018. CBB Bank expressed a willingness to enter into a letter of intent with the Debtor in advance of extending approximately $1.2 million of credit. This

---

[27] Such allowed amount included $19,391.36 in taxes paid to the City of Dallas on the Debtor's behalf by Sunshine. Adversary Opinion at 21.

relationship ultimately failed to consummate, however, due to circumstances unrelated to the Debtor's creditworthiness or industry. Thereafter, again at the behest of Mr. Bagaria, the Debtor and Sunshine entered into the Amended Note, rather than further pursuing a traditional commercial loan.

Moreover, the Court found in the Adversary Opinion that Sunshine was an extremely "hands off" lender. Neither the Debtor nor Sunshine maintained a single physical record of the Debtor's payments made pursuant to the Original Note and the Amended Note. Further complicating the relationship, a dizzying array of numerous copies of numerous documents were exchanged between the Members, Mr. Bagaria, and Mr. Doddi via email throughout the relationship between the Debtor and Sunshine. The Court further found that Sunshine barely serviced the loan at all, choosing instead to rely heavily on Mr. Bagaria to interact with the Members (almost exclusively Mr. Joshi), prepare necessary documentation, and even to negotiate the terms of the Amended Note. Sunshine's course of conduct with regard to the Original Note and Amended Note could not be less consistent with Mr. Busch's description of a typical hard money lender's relationship with its borrowers. Thus, the Court concludes that the Trust has failed to show that its proposed interest rate, which was higher than the proposed rate for commercial hard money loans, was in any way justified.

Finally, the Court is extremely reticent to grant the Trust the 10% contractual rate of interest due to the highly disconcerting circumstances leading to the execution of the Amended Note. In the Adversary Opinion, the Court found that Mr. Joshi executed the Amended Note both on his own behalf and by forging Mr. Sinkular's signature after being told that the document was necessary for "tax purposes" and under the threat of imminent foreclosure by Sunshine. The Court has expressed serious concerns with the substantially unexplained addition of $165,000.00 to the

principal of the Original Note and the likewise substantially unexplained hike of the Original

Note's interest rate from 8% to 10%.[28]  As a court of equity, the Court is granted broad discretion

in "refusing to aid the unclean litigant."  *Precision Instrument Manufacturing Co. v. Automotive*

*Maintenance Machinery Co.*, 324 U.S. 806, 815 (1945).  Unfortunately, the Trust stepped squarely

into Sunshine's shoes when it acquired its claim, including adopting Sunshine's questionably clean

hands from its dealings with the Debtor.  *See Irrigation Ass'n v. First Nat'l Bank*, 773 S.W.2d 346,

348 (Tex. App.–Dallas [5th Dist.] 1989, writ denied) ("It is axiomatic that an assignee walks in

the shoes of his assignor.").

Conversely, it cannot escape mention that this Debtor is in a unique industry, operates a

primarily cash-in-hand business, practices little-to-no recordkeeping, and is actively renovating

the Property with the *goal*, but not the guarantee, of opening and operating a successful adult

nightclub in the near future.[29]  This Court, therefore, must fall in line with the plethora of other

courts in finding that no efficient market exists for this loan.  *Tex. Grand Prairie*, 710 F.3d at 333.

Moreover, the evidence at the Confirmation Hearing showed that the Debtor's income relies

exclusively on Enterprise's current business, primarily an adult theater, which has been and

continues to be substantially depressed, due in large part to the ongoing construction of the

nightclub and the global COVID-19 pandemic.  The Court finds, therefore, that *some* risk premium

is appropriate to account for these risks.  Mr. Busch testified that traditional commercial loans

typically carry interest between 4–6% annually.  Additionally, CBB Bank, in its letter of intent,

proposed to give the Debtor two points over prime in 2018, a time at which the Property was not

as near to completion and operation as a nightclub as it is currently.  The Court finds that an interest

---

[28] Order Granting in Part and Denying in Part Motion to Alter or Amend the Judgment, JSAA Realty, LLC v. Hak Man Lee Trust (Adv. No. 21-3042), ECF No. 44 at 3.

[29] The Court will discuss this factor further below with regard to feasibility.

rate on the high end of this typical spectrum accurately captures the risk factors described above as well as the mitigating circumstances of the Trust's extremely sizable equity cushion and position firmly at the top of the proverbial heap as the only significant secured creditor.[30] The Court's reasoning and finding herein appears in line with applicable precedent in the Fifth Circuit.[31] Accordingly, the Court finds that the Debtor's proposed 6% interest rate is fair and equitable given the circumstances described above.

In conclusion, the Court finds that the Trust failed to show that either the Original Note or the Amended Note was a hard money loan, that Sunshine or the Trust was a hard money lender, or that it is entitled to the contractual rate of interest as a matter of equity. The Court does recognize that this Debtor is not without risk and that its fate post-confirmation is anything but certain, but the Court cannot disregard the significantly mitigating factors of the Trust's equity cushion and the lack of other significant secured creditors. Thus, the Court finds that the Debtor's proposed interest rate of 6% (which is Prime plus 2.75%) is fair and equitable with regard to the Trust's secured claim.

### B. Good Faith Proposal of the Plan

The Trust's next objection to confirmation is that the Debtor did not propose the Plan in good faith. In support of this argument, the Trust argues that this case was used to stop a valid foreclosure, that the Plan does not benefit the Debtor, that the Debtor's business does not benefit the community, and that the Plan does not benefit creditors.

---

[30] *See Tex. Grand Prairie*, 710 F.3d at 333–34 (holding that risk adjustments typically fall within the 1–3% range and are based on a holistic assessment of the debtor, the loan, and the feasibility of the debtor's plan).

[31] *See id.* at 333 (applying the Till prime-plus formula); *In re Couture Hotel Corporation*, 536 B.R. 712, 741–49 (Bankr. N.D. Tex. 2015) (Houser, J.) (applying the *Till* prime-plus formula); *In re LMR, LLC*, 496 B.R. 410, 427–37 (Bankr. W.D. Tex. 2013) (discussing *Till* and *Tex. Grand Prairie* at length and ultimately applying the prime-plus formula).

To be confirmed, a plan must be "proposed in good faith and not by any means forbidden by law."[32]  In the Fifth Circuit, good faith is determined "in light of the totality of the circumstances surrounding establishment of the plan, keeping in mind the purpose of the Code to provide debtors with the reasonable opportunity for a fresh start."  *Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop.)*, 150 F.3d 503, 519 (5th Cir. 1998).  "Generally, where a plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement . . . is satisfied."  *Western Real Estate Equities, L.L.C. v. Vill. at Camp Bowie I, L.P. (In re Vill. At Camp Bowie I, L.P.)*, 710 F.3d 239, 247 (5th Cir. 2013).  The Trust also pointed to seven factors commonly applied in analyzing whether bad faith exists in the context of seeking dismissal or relief from the automatic stay.  ECF No. 103 at 2–3 (citing *In re 1701 Commerce, LLC*, 477 B.R. 652, 657–58 (Bankr. N.D. Tex. 2012) (Lynn, J.)).[33]

The Court candidly admits that, in terms of the factual record, this case is relatively inscrutable.  As highlighted in the Adversary Opinion, documentary evidence in this case is almost non-existent.  Nevertheless, the Court finds that the record is nearly devoid of evidence suggesting that the Plan was not proposed in good faith.  Indeed, the Court finds it difficult to conceive of a witness who more embodies the "legitimate and honest purpose to reorganize" than Mr. Sinkular, who testified at the Confirmation Hearing for nearly ten hours over the course of two days over his desire to build an operational, top-tier adult nightclub.

---

[32] *Id.*at § 1129(a)(3).

[33] The factors, which the Court will hereinafter call the *Little Creek* factors, are: (1) the debtor has one asset, such as either undeveloped or developed real property, encumbered by secured creditors' liens; (2) debtor has engaged in improper pre-petition conduct; (3) the debtor's property has been posted for foreclosure, and the debtor has tried unsuccessfully to prevent this foreclosure in state court; (4) the filing of bankruptcy enabled the debtor to evade court orders; (5) the debtor employs few or zero employees other than its principals; (6) there is little or no cash flow or source of income to sustain a reorganization; and (7) there are few if any unsecured creditors and their claims are relatively small.  *1701 Commerce*, 441 B.R. at 657–58 (citing *Little Creek Dev. Co. v. Commonwealth Mortg. Co. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072–73 (5th Cir. 1986)).

As to the Trust's specific allegations, the Court finds each unavailing. As described above, the Court is extremely suspect of the chain of events leading up to the "valid foreclosure" giving rise to the filing of the Debtor's petition. Even absent these highly questionable circumstances, the Court notes that the bankruptcy system is commonly, and appropriately, employed in the face of imminent foreclosure to effectuate nonetheless legitimate reorganizations.[34] The Court finds the assertion that the Plan does not benefit the Debtor or the creditors similarly unavailing. The Plan proposes to pay the Trust in full while resolving several tax liens on the Property and provides for a 100% payout to general unsecured creditors, of which there are, granted, very few. Nevertheless, the Debtor's Plan has every hallmark of a legitimate reorganization or, at the very least, does not appear to the Court to fail to benefit the Debtor or its creditors. Finally, the Trust did not cite any law requiring that a debtor's business "benefit the community" as a prerequisite to participation in the bankruptcy system. An adult nightclub is an employer like any other business. RCI Hospitality Holdings, for example, upon which the Debtor based some of its projections, is a publicly traded company with a market capitalization of more than $500 million. It cannot go without mention that the Trust had a choice whether to buy a loan, the borrower of which is an SOB, post-petition, and knowingly chose to do so.[35] To judge the Debtor's business but not the lender that chose to finance it with equal critique would be disingenuous.

---

[34] *See Little Creek*, 779 F.2d at 1073 (holding that the "litigation tactic of attempting to retry the state court [foreclosure] action in the course of the hearing on the motion for relief from the stay[] did not provide sufficient evidence to show lack of good faith); *In re Route 202 Corp.*, 37 B.R. 367, 373 (Bankr. E.D. Pa. 1984) ("The filing of a bankruptcy petition on the eve of a scheduled foreclosure is not sufficient by itself to constitute bad faith unless it can be shown that the business entity under which the debtor is operating has no valid business purpose."); *see also Coleman v. Aegis Mortg. Corp. (In re Coleman)*, Civ. Action No. 3-99-CV-1642-P, 1999 U.S. Dist. LEXIS 15635, at *5 (N.D. Tex. 1999) (citing *Route 202 Corp.*, 37 B.R. at 373).

[35] *See In re KB Toys Inc.*, 736 F.3d 247, 255 ("Claim purchasers are entities who knowingly an voluntarily enter the bankruptcy process. Thus, a purchaser should know that it is taking on the risks and uncertainties attendant to the bankruptcy process."); *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*, 333 B.R. 205, 2019–20 (Bankr. S.D.N.Y. 2005) (finding that the bankruptcy court's equitable powers include the power to equitably subordinate claims that did not arise from any misconduct, but were held by a creditor who is found to have engaged in inequitable conduct regarding the debtor).

Although it is unquestionable that several of the *Little Creek* Factors are present in this case, determining the Debtor's good faith "depends largely upon the bankruptcy court's on-the-spot evaluation of the [D]ebtor's financial condition, motives, and the local financial realities." *Little Creek*, 779 F.2d at 1072. Here, it is obvious that the Debtor has one asset, the Property, has very few regular employees other than the Members, and has relatively few unsecured creditors with small claims. These facts are indicative of hundreds, if not thousands, of bankruptcy cases, and are hallmarks of "single asset real estate companies," which are now defined and accepted types of debtor entities post-Bankruptcy Reform Act of 1994, which itself was eight years post-*Little Creek*.[36]

Thus, the Court finds these facts unavailing as to bad faith. Likewise, the record is devoid of evidence of the Debtor's improper pre-petition conduct, unsuccessful attempts at defending foreclosure in a state court, dodging court orders, or lack of cash flow to sustain reorganization. Furthermore, the Debtor was not, as the Trust appears to argue, "created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors." *1701 Commerce*, 441 B.R. at 658 (citing *Little Creek*, 779 F.2d at 1073). Rather, the Debtor was formed in 2016 at the *inception* of the loan giving rise to Sunshine's attempted foreclosure and this bankruptcy case. Mr. Sinkular did testify that he did not know why the Debtor was formed in 2016, but he recalled it was at Mr. Bagaria's behest. Thus, the Court finds that this fact alone does not a bad faith case make. Therefore, the Court finds a substantial dearth of evidence suggesting that the Plan was filed in bad faith, and the Trust's objection on that ground is hereby overruled.

### C. Best Interests of Creditors

---

[36] *See Kara Homes, Inc. v. Nat'l City Bank (In re Kara Homes, Inc.)*, 363 B.R. 399, 403–04 ("The [Bankruptcy Reform Act of 1994] provided special treatment of single asset real estate by defining the term . . . in Bankruptcy Code Section 101(51B) and by placing single asset real estate cases on an expedited reorganization track through the enactment of Bankruptcy Code § 363(d)(3).")

Next, the Trust asserts that the Plan is not in the best interests of creditors because it fails to provide more to the Trust than it would receive in a hypothetical liquidation of the Debtor's assets pursuant to § 1129(a)(7) of the Code. The Trust also objects on the ground that the continuation of Debtor's current management, as proposed in the Plan, is likewise not in the interests of creditors, as required by § 1129(a)(5) of the Code. The Court will address each objection in turn.

The Trust's objection pursuant to § 1129(a)(7) is plainly inconsistent with the Code. The Trust states in its Objection that the Plan does not comport with § 1129(a)(7) because "[t]he Debtor must prove that . . . the plan provides a *greater* recovery to creditors than would be available in a Chapter 7 liquidation." ECF No. 65 at ¶ 30 (emphasis added). Section 1129(a)(7)'s best interests of creditors test requires, however, that, to be confirmable, a plan must provide to each impaired class voting to reject the plan "property of a value, as of the effective date of the plan, that is *not less than* the amount that such holder would so receive . . . if the debtor were liquidated." 11 U.S.C. § 1129(a)(7) (emphasis added). In other words, the best interests of creditors test requires that "each creditor that did not vote to accept the Plan is receiving *at least as much* under the Plan as that creditor would receive in a Chapter 7 liquidation of the Debtor." *Cantu v. Schmidt (In re Cantu)*, 784 F.3d 253, 262 (5th Cir. 2015); *Couture*, 536 B.R. at 736.

The Debtor's Fourth Amended Disclosure Statement included a liquidation analysis predicated on an assumed liquidation value for the Property of $1.3 million, or 70% of the fair market value of the Property, which would nevertheless result in a 100% payout to creditors. ECF No. 44-6. Likewise, the Debtor proposed a 100% payout to creditors under the Plan. Thus, the Trust will receive under the Plan at least as much as it would receive in a liquidation of the Debtor's assets, specifically, 100% of its allowed claim. A plan that pays creditors in full cannot fail the

best interests of creditors test of § 1129(a)(7). *Couture*, 536 B.R. at 736. The Plan, therefore, complies with § 1129(a)(7) of the Code and the Trust's objection on this ground is overruled.

Section 1129(a)(5) requires both that the Debtor disclose who will manage the reorganized debtor and that the appointment of those individuals is "consistent with the interests of creditors and equity security holders and with public policy." 11 U.S.C. § 1129(a)(5)(A)(i)–(ii). The Trust objects on the ground that the Members "clearly mismanaged" the Debtor and Enterprises. ECF No. 65 ¶ 26. The Trust points to the fact that the Members "took out loans with balloon payments for the renovations which its previous revenue model had no ability to repay," that the Members do not have experience running an adult nightclub, and that the Members are currently running a "dying business." *Id.* ¶ 27.

The Court finds significant illumination on these points in the wake of the Adversary Opinion. Therein, the Court found not a mismanaged Debtor led to bankruptcy by its own comedy of mismanagement errors. Rather, the Court found that the Debtor was embroiled in a poorly defined, poorly documented loan relationship with an unsophisticated lender leading to a large number of asserted defaults and some unfortunate reactions thereto, the culmination of which was the execution of the Amended Note. Moreover, many, if not all of these issues, trace back to precisely one individual, Mr. Bagaria, who left his mark on nearly every interaction between the Debtor and Sunshine. Finally, the Debtor presented credible testimony at both the Confirmation Hearing and in the Adversary Proceeding that the Members derived sufficient revenues from Enterprises to make the majority of the loan payments[37] for which they were obligated, including bringing the Amended Note current in August of 2020, two months prior to the Petition Date.

---

[37] Additionally, the Court found in the Adversary Opinion that the periods of missed payments that did exist coincided closely with efforts by the Debtor, Mr. Bagaria, and Sunshine to refinance or otherwise modify their lending relationship.

The Court agrees that the Members are, indeed, running a dying business in terms of running an adult video theater. The Court also finds, however, that the Debtor is *actively pivoting* from such dying business and has been doing so since Enterprises' sales began to diminish in the late 2000's.[38] Moreover, the Debtor presented two witnesses both of whom credibly testified that they were planning on investing the capital necessary to allow the Debtor to complete renovations on the Property. The Court recognizes that this renovation project has been extended and has come at *great* cost to the Debtor, the Debtor's creditors, including Sunshine, the Members, and the Members' families and friends. The Court also recognizes, however, the evidence presented at the Confirmation Hearing showing the results of the Debtor's efforts so far, as well as Mr. Sinkular's extensive, credible testimony as to his personal sweat equity in the Property, his commitment to running the business at the completion of the renovations, and his and Mr. Joshi's decision to allocate more authority to Mr. Sinkular.

Based on this body of evidence, as well as the Court's findings of fact in the Adversary Opinion, the Court finds that the continuation of the Members as management of the Debtor post-confirmation is in the best interests of creditors and equity holders and consistent with public policy. Although the Debtor may certainly require experienced nightclub managers and the like in the future, Mr. Sinkular testified to the Debtor's intention to make such hires as needed. As such, the Trust's objection that the Plan does not comport with § 1129(a)(5) is overruled.

### D. Feasibility

The final ground on which the Trust objects to confirmation of the Plan is that it is not feasible given the operations of the Debtor and Enterprises. Section 1129(a)(11) provides that a

---

[38] The Court must also note here the Original Note was executed in 2016, well into the decline of the adult DVD sales and movie theater business. Even the most basic lender due diligence, from either Sunshine or the Trust, would have definitively brought this information to light. As such, the Court struggles to believe that the difficulty of the Debtor's and Enterprises' current operations was somehow an unknown, or unknowable, quantity.

plan may only be confirmed if such confirmation is "not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." 11 U.S.C. § 1129(a)(11). "The Court's overarching goal in assessing a plan's feasibility is to determine whether the debtor has shown, by a preponderance of the evidence, 'the existence of a reasonable possibility that a successful rehabilitation . . . can be accomplished within a reasonable period of time.'" *In re Friendship Dairies*, Case No. 12-20405, 2014 Bankr. LEXIS 13, at *26 (Bankr. N.D. Tex. Jan. 3, 2014) (Jones, J.) (quoting *In re Anderson Oaks (Phase I) Ltd. P'ship*, 77 B.R. 108, 110 (Bankr. W.D. Tex. 1987)). The success of the Debtor's plan does not need to be guaranteed but must have a reasonable assurance of commercial viability. *Id.* at *27. "Still, a plan may be approved despite having a marginal prospect of success if the secured creditor is fully protected in the event of the plan's failure." *Id.* at *28 (internal quotations omitted) (citing *Briscoe Enters.*, 994 F.2d at 1166). The burden of proving feasibility is the Debtor's by a preponderance of the evidence. *Id.* at *26–27.

In assessing feasibility, courts commonly rely on several factors: (1) the debtor's capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of continuation of management; and (6) any other related matter. *Id.* at *28. Although these factors are instructive, the feasibility test is flexible, and courts have discretion as to how to weigh and consider the various factors. *Id.* at *28–29. In this case, the Court weighs heavily several matters. First, the Court places great weight on the testimony of Mr. Shah and Mr. Bhatt, both of whom testified, uncontroverted, to their ability and intent to inject the capital necessary to finish the renovations on the Property, collectively, $300,000.00.[39] The Trust's argument that the Plan projections are aspirational is well-taken. The success of the Plan

---

[39] Mr. Bhatt, specifically, testified to having sufficient liquid capital to fund the remaining renovations and that he would invest such capital with few terms with regard to repayment.

turns almost entirely on the Debtor's ability to finish renovations and operate as a nightclub in the near future, which Mr. Sinkular testified was approximately $200,000.00.[40] That is precisely the reason, however, the Court places such weight on the Debtor's investors' testimony. The evidence presented at the Confirmation Hearing showed that the Debtor's opening as an adult nightclub is almost assured at the completion of the renovations, which is itself almost assured by Mr. Shah and Mr. Bhatt.[41]

The Court further places substantial weight on the Debtor's consistent reservation of cash for Plan payments (the "**Reserve**") during the abeyance and subsequent pendency of this Memorandum Opinion. According to the Debtor's most recently filed Monthly Operating Report, the Debtor has received and reserved, for a period of 15 months, sufficient monthly cash receipts to fund its Plan over that period, without its future revenues from operating an adult nightclub. *See* ECF No. 127. The Trust cited *Friendship Dairies* for the proposition that "[o]ne way to assess the reliability and soundness of a debtor's projections is to use the period of the case as a test-run." 2014 Bankr. LEXIS 13, at *31 (citing *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997)). The Court could not agree more and finds that the period of this case shows a successful test-run for the Debtor's Plan.

Additionally, the Court again looks to the Trust's immense equity cushion with regard to feasibility. As previously stated, even if the Plan only has a marginal chance of success (and the Court assigns more than a marginal chance to this Plan), the Court may confirm the Plan regardless, if the Trust is fully protected in the event of a liquidation. *Id.* at *28. In the event that the Plan

---

[40] Mr. Sinkular also credibly testified that initial opening costs for the nightclub could be between $200–250,000.00 and that he planned to fund these opening costs through the sale of real property he currently owns in Las Vegas.
[41] The Court here recognizes the substantial time that has passed since the Confirmation Hearing in May of 2021. At that time, occupancy and operational restrictions arising from the ongoing COVID-19 pandemic were significantly more stringent than those that exist today. Mr. Sinkular admitted that the COVID-19 restrictions at that time cast some doubt on the opening of the nightclub even after completion of the renovations.

Case 20-32504-mvl11 Doc 129 Filed 02/24/22 Entered 02/24/22 15:26:11 Page 26 of 30

does fail, and the Debtor is forced to liquidate, the proceeds from such sale would be enough to cover all claims in this case nearly three times over, assuming, as the Debtor did, a 70% liquidation value for the Property. *See* ECF No. 44-6. Thus, the Trust is fully protected in the event of the Plan's failure.

For each of these reasons, the Court finds that the Plan is feasible. The Court is not significantly concerned with the Debtor's capital structure, the ability of the Members to continue running the business of the Debtor, the likelihood that the Members continue in their management of the Debtor, nor economic conditions. As such, the Trust's objection as to feasibility is hereby overruled.

### E. Rental Rate Adjustment

Although each of the Trust's objections is overruled, the Court must address the uncontroverted testimony adduced at the Confirmation Hearing as to the *potential* rental rate for the Property, post-renovation. Again, this Debtor does not operate the underlying theater and will not operate the nightclub business, its tenant does and will. The Debtor merely owns the Property itself. Mr. Gaines and Ms. Friedberg gave conflicting testimony as to the appropriate rental rate for the Property in its current condition. Mr. Gaines testified that the Property would only be rentable as a warehouse in its current state, fetching approximately $4 per square foot triple net. Ms. Friedberg, on the other hand, believed that the Property could have rented as a retail space, earning upwards of $10 per square foot triple net. Despite this disagreement, however, Mr. Gaines testified that the rental rate for the Property would increase *substantially* if the Property were to operate as a nightclub. Debtor's counsel, during the Confirmation Hearing, likewise conceded that the rental rate should go up upon completion of renovations and the Property's opening as a nightclub. As such, the Court will confirm the Plan *provided* that the Debtor files, within 21 days

after the entry of this Memorandum Opinion, a modification of the Plan providing for a reasonable increase in the rental rate paid from Enterprises to the Debtor upon the beginning of nightclub operations. The rental rates shall match or better the amounts due and payable to the Trust on a monthly basis, together with a provision for insurance and taxes to the extent not paid directly by Enterprises.

## IV.   **THE TRUST'S LIFT STAY MOTION**

As discussed above, the Trust filed the Lift Stay Motion on March 31, 2021, and the Court held a hearing thereon contemporaneously with the Confirmation Hearing. The Trust requests relief from the automatic stay under 11 U.S.C. § 362(d)(1) and (3), which provide for relief from the stay for cause, including lack of adequate protection, and, specifically with regard to single asset real estate debtors, relief from the stay for failure to timely file a plan that has a reasonable possibility of being confirmed within a reasonable time. *Id.* The Trust relies primarily on § 362(d)(3), arguing that the Debtor's original plan (the "**Original Plan**"), filed well within 90 days of the Petition Date, was unconfirmable for a number of reasons.

First, the Trust argues that the Debtor's failure to file a disclosure statement with adequate information within 90 days of the Petition Date violated § 362(d)(3). The Trust flatly asserts that, because the Disclosure Statement did not contain adequate information, the Original Plan was not reasonably confirmable within a reasonable time. Notably, the Trust failed to cite any caselaw supporting this position, a limitation to which the Trust admitted in the Lift Stay Motion. Rather, the Trust relied instead on policy arguments, which the Court found unpersuasive. This Court is unwilling to establish precedent by which every single asset real estate debtor must rapidly file an approvable disclosure statement to survive a motion for relief from the automatic stay, especially absent any caselaw or Bankruptcy Code-based argument supporting that position.

Next, as a basis to lift the automatic stay, the Trust rehashes its Objection to the Plan, by alleging that the Plan violated § 362(d)(3) for failing to meet the requirements of § 1129, specifically for: (1) being filed in bad faith, (2) proposing the continuation of management against the best interests of creditors, (3) not being in the best interests of creditors generally, (4) lacking feasibility, and (5) failing to treat the Trust's claim fairly and equitably. These arguments track nearly word-for-word the Objection. Although the Trust, by these objections, may have shown why the Original Plan was not confirmable *when it was filed*, the Trust has failed to show that these alleged infirmities prove that the Original Plan was not reasonably confirmable within a reasonable time. It is not the duty of the Court to decide whether a certain plan of reorganization could be successfully carried out, but only to decide whether it was reasonable to expect that a plan of reorganization *could be* effected. *In re Julius Roehrs Co.*, 115 F.2d 726, 724 (3d Cir. 1940). Moreover, the determination that no possibility of reorganization exists should be reached only upon the strongest evidentiary showing. *In re RCM Global Long Term Capital Appreciation Fund Ltd.*, 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996). Here, the Trust is a far cry from making the strongest evidentiary showing that no reorganization was possible, and thus the Court concludes that the Original Plan met the requirements of § 362(d)(3).

Finally, with regard to § 362(d)(1), the Trust raises the same bad faith argument that has been played on repeat throughout this case, and which this Court has routinely found to be baseless, especially in light of the tortured factual history culminating in the filing of the Debtor's Petition. The Court is utterly without evidence that this Debtor has, at any point, acted in bad faith. Thus, because each of the Trust's arguments fails to demonstrate cause under § 362(d)(1) or that the Original Plan was not reasonably confirmable within a reasonable time pursuant to § 362(d)(3), the Court will deny the Lift Stay Motion.

## V.  <u>CONCLUSION</u>

This case is, in many senses of the word, atypical, even amongst single asset real estate cases.  The Court recognizes the somewhat unenviable situation in which the Trust finds itself—many, if not all, of the grounds upon which the Court has overruled the Trust's objections were not of the Trust's making and originated, in some instances, years ago as the result of the atypical lending relationship amongst the Debtor, Sunshine, and Mr. Bagaria.  Nevertheless, the Trust *chose* to acquire its claim post-petition and must sleep in the bed that Sunshine made for it.  The Court hereby finds that the Debtor's proposed interest rate of 6% applied to the Trust's claim is fair and equitable, as are the remainder of the terms of the treatment of the Trust's claim.  The Court further finds that the Plan was proposed in good faith and is in the best interests of creditors.  Finally, the Court finds that several significant factors show that the Plan is feasible, even if somewhat aspirational, given the Debtor's proposed treatment of the Trust's claim.  As such, the Trust's Objection is overruled in its entirety.

Nevertheless, the Court finds that the Plan must be modified to provide for the execution of an amended lease between the Debtor and Enterprises pursuant to which the rental rate paid for the Property will increase to a reasonable market rate at the commencement of nightclub operations consistent with the Court's findings herein.  The Debtor shall file such modification within 21 days of the entry of this Memorandum Opinion, as more specifically provided in the Court's order entered contemporaneously herewith.  The Court further finds that the Reserve shall be remitted to the Trust within 21 days of the Court's contemporaneous order confirming the Plan becoming final for application to amounts due post-petition.

Finally, for the reasons stated above, the Lift Stay Motion will be denied by order entered contemporaneously herewith.

**### END OF ORDER ###**